The first is No. 14-3514, Federal Trade Commission v. Wyndham Worldwide Corp,et.al, Mr. Asaf and Mr. Marcus. I'd like to reserve five minutes of rebuttal with the Court's permission. That's fine. May it please the Court, Gene Asaf on behalf of Wyndham. After Wyndham was the victim of Russian cyber criminals, the FTC brought an unfairness action, and we believe it should be dismissed for three reasons. In brief, first, as a matter of statutory interpretation, whatever unfair trade practices means, it cannot be stretched to mean negligent behavior and clearly negligent or negligent omissions which allow criminal activity to take place. Second, in terms of our fair notice point, you had what? You had three instances of hacking, is that correct? One in 08 and two in 09. Your Honor, I think, yes, three are pled, and because we're on motion to dismiss, we've had to accept those pleadings. But the Russian cyber criminals were never apprehended, and there's been no showing at this point regarding what happened with the back doors, which makes part of this case interesting. In other words, I agree. They pledged three incidents. The federal criminal authorities came in, tried to find out what happened. Unfortunately, this is beyond the record, but unfortunately, there were back doors left, which not even the consultants figured out. So Wyndham went out. They hired consultants, not one, not two, not three, but five groups. They came in, best technologists in America. They couldn't figure out that the Russians had left behind back doors, which allowed the incident. Why isn't that a matter of proof? It is going to be a matter of proof, Your Honor, but as opposed to the substantial consumer harm, which I don't think is beyond the pleadings, and I think it's not a matter of proof, I think that that issue is one not only of Twombly, but it actually goes to the entire statutory framework, even under the FTC's view, of what constitutes a— So you reject the analogy, the negligence, that the order of dismissal in the LabMD order provided? Yes, Your Honor. I think, actually, and that's an issue which, by the Court's questions, caused us to go back and revisit not only LabMD and the 28J filings, but look at the entire procedural framework of the FTC. And there is clearly no deference here, because there's not— I understand there's no deference. All it is is, I mean, the Eleventh Circuit made clear that particular point as well. But the arguments in the LabMD were pretty persuasive. I mean, if we were to follow those, would you have any arguments to make before us? I would, Your Honor, because I would actually use the FTC's own position. So in LabMD, there are two key pleadings. One is the motion to dismiss, and the other is a motion to stay decided by the Commission. And in the motion to stay, the Commission cites a reliable sprinkler, the D.C. Circuit case by Judge Garland. And the Commission says, we haven't determined anything yet. This is preliminary, because what's going to happen is, as a policy matter and a factual matter, we will now hear the allegations. And so nobody's rights and obligations have yet been determined, and thus not final. So, Your Honor, I actually—I don't think that the LabMD decision is even illustrative of— I can bet where I think the Commission would like to come out. But in terms of administrative law, in terms of administrative law, I don't think they've gotten there under reliable sprinkler. And that has not been cited in the brief, Your Honor. But I would encourage the Court to look at reliable sprinkler by Judge Garland. Is LabMD a litigation position? Excellent question, Your Honor. In terms of—I think it's been argued two ways by the briefs below. I don't think it's final, because—and I think it's more akin to the litigation positions, such as amicus briefs, or litigation position before the final determination. So I think, at best, it's a litigation position that's not final. So it would be akin to those lines of cases where the SEC filed amicus briefs or took litigation positions, and the Court said these are mere litigation positions not entitled to deference. Your Honor, I think the starting point of the statutory interpretation question— When did Wyndham send out, during 1908-09, the statement that it had encryption ability that it was using, that it had firewalls that it was using, and that it was keeping up with all commercially reasonable standards? Your Honor, they didn't send that out, but it was part of the website, Terms of Service. So when you click down to Terms of Service, there are multiple paragraphs on what we are doing, and we have very specific statements as to what we're doing, the type of encryption technology we're using, the types of sockets we're using. And that's one of the reasons, Your Honor, that I want to emphasize. That deception point is not only not in front of the Court, but the ruling that we're advocating from the Court would do nothing to limit the FTC's agenda on cybersecurity with respect to deception. And so if a company says, this is what we're going to do on cybersecurity, and they don't live up to that, we have no quarrel with that. And so the FTC would be, in fact, on Friday, when President Obama announces the new proposed legislation, the FTC's first response was, what we tell companies is keep your words on cybersecurity. Do what you say and say what you do. And so I think it's very important to say we haven't contested the deception point, and that's a much more narrow discussion for Judge Salas, which is why the party didn't even ask for that to be certified. It's whether a reasonable consumer would be deceived and the likelihood of deception. But that's a much more narrow question, Your Honor, and that would not be implicated by the ruling we're advocating in terms of the unfairness doctrine. Could somebody establish standards for protecting data that's accumulated electronically by different – well, by companies, but I gather the federal government – on the news this morning, there's an agency that's being accused of not guarding its information sufficiently. Should there be a standard? Should it just be for commercial enterprise? If there should be a standard, who should develop it? So a very substantial policy question, Your Honor. The GAO issued a report two years ago saying multiple federal agencies have been hacked. In terms of the standard, that's why I think there's such an easy pass-out that gives all stakeholders a win here. The SEC has done it with FASB. They don't say just look at reasonable accounting or else we're going to go after you. There are two critical standards here that people can look at, or the FTC or the federal government can encourage people to look at. One is PCI, which is by the card brands, And the other is the NIST standards that, again, is in play now in the congressional debate about whether those NIST standards should now be developed or implemented. President Obama's executive order of last year said for critical infrastructure, such as power plants and banks, those NIST standards will now apply. And so I think we're moving in the right direction, and I think there are standards out there that an agency or the stakeholders could develop, and I think I'm hopeful that we will get there because I think it would be very useful. The transaction cost today of trying to guess where the FTC is and trying to guess and go through an investigation. Could you make a little query of the FTC as to whether your practices are compliant? To the FTC's behavioral answer, my understanding is no, Your Honor. And ironically, President Obama's proposed legislation from last week would now actually allow companies to go in to make an inquiry, and they would then get a safe harbor. This may go both to jurisdiction and to notice, but isn't it difficult to say that you were not on notice, actual notice, that this kind of reasonable effort on your part was indicated? And, I mean, there were all these consent decrees. There were testimony before Congress. There were orders that issued 34 cease and desist orders. How can you say that you were not on notice in these matters? Well, with respect to the consent decrees, the large majority of them prior to the Wyndham breach were deception, which we talked about earlier. There were five unfairness to be sure, but even those, Your Honor, if you look at those, what they say is you shall maintain reasonable data security methods. They don't go to Judge Roth's questions and say, thou shall implement PCI or data security that's consistent with these standards. And so in terms of what a federal litigant or a potential litigant will look at, Your Honor, when a district court judge would enter an order, for example, in this case, they would never be able to enter an order saying you shall have reasonable data security measures. They would have to detail, because it's on penalty of contempt, what exactly you're on notice of. And similarly, Judge Sirica, for your question, what were the companies on notice of? The first unfairness decrees were roughly two years before the breach, and there were five of them. But all they said is reasonable data security, and that's against the backdrop of every single federal court case. Including Sperry v. Hutchinson? I'll even get to that case. But there's nothing in the federal court decision law that is anything less or that is mere negligence. So you look at every court of appeals decision, and it's always something more than mere negligence as to what constitutes an unfair treatment. The argument here was that you got three alleged hacking attacks, plus a statement put out that you have systems in place, and the statements are not true. That would be the plus that would be alleged here. And on the plus factor, Your Honor, analytically, I think the deception point is separate and apart from what – because that is a very narrow issue of what the consumers were told, and we believe, actually, if you look at the website, and it's in the appendix, in terms of the technology we were using, that's why we didn't make that part of the interlocutory appeal request. Because one of the things – you asked about pleading, Judge Sarekha. One thing that's also going on here is the FTC has not and actually cannot allege that any of the alleged deficiencies that they've now looked at through two years of investigations were the cause of the breach. That's really important. Likely cause or likely cause? Or likely cause. Not even likely cause, Your Honor. At this point, they can't even say that these were the likely cause. And we know that because the consultants and the federal criminal authorities couldn't even identify the likely cause of the breach. So it gets to the constraint on the agency, Your Honor, and the cost imposed by this. What happens in today's world is that a company like Wyndham goes through a two-year investigation. The FTC looks at over a million pages of documents, and are they going to identify somebody that didn't change their password on time? They surely are. I would imagine in every organization that would happen. But that can't serve as the ability for the agency then to go forward because there's no constraint. As one commissioner said, our entire agenda is ex post, not ex ante. And it's the only regime that I'm aware of in administrative law that allows that, especially for mere negligence. But if so, so if you take the most extreme position, no firewalls, no passwords, et cetera, et cetera, none of this would qualify as unfair? I think you still have the deception point, Your Honor. But I don't think, first of all, I don't think that's the allegations in this case. No firewalls, no passwords, et cetera. And at some point, Your Honor, yes, there becomes a pleading issue of whether they would plead something more than negligence. But that hasn't happened here. They had a two-year investigation, and what they pled were negligence, with negligence and, in fact, negligent omissions. They haven't pled recklessness. They haven't pled gross negligence. And so I think in terms of the line drawing, Your Honor, we're clearly just by their pleading on the other side of that line. Excuse me. Does unfairness require a positive actor? Can unfairness be a failure to act? So I don't know if the Court needs to reach that decision. The statute says act in practices. I'm not relying solely on the act versus omission distinction. But here, again, in terms of pleading, what they pled is largely a negligent omission case. But that's not central to our argument. I do think it raises concerns both of fairness and statutory authority when somebody is being the subject of a federal law enforcement action for negligent omissions that allow criminal activity by a third party. And, again, as far as we know, there's been no other FTEs. May I finish, Your Honor? Go ahead. Thank you. I was going to remind you, Your Honor, when I was sworn in here in 1990 by Judge Weiss, somebody else said that. But I thought it would be a stop from using the extra time that I was given in 1990. It carries over sometimes. You have a long memory. In terms of ‑‑ I'm sorry, Judge Rothman. I was answering your question after omission. Oh, after omission. And so here, the complaint is fairly read as negligent omissions, which, again, goes to, I think, the transactional cost. I'm very comfortable with arguing the statutory language here and looking at the federal courts of appeals that look at what happened in terms of application of the words unfair trade practice. And I'd like to make two quick points, Your Honor, before my remaining four minutes run out. I think, in some ways, you look at both the 11th Circuit and the 4th Circuit approach to the statutory language, unfair trade practice, with the same company at issue, Orkin, the pesticide company. So the 11th Circuit says when Orkin implements a policy to take advantage of consumers and change their contracts, raise their prices, and there are 200,000 people hurt, that rises to the level of unfair trade practice, the 11th Circuit. The 4th Circuit, now to be sure, it's under the Baby FTC Act, but nevertheless looking at the same statutory construct. And what does the 4th Circuit do? In allegations where the pesticide company failed, failed to properly apply pesticides to certain consumers, the 4th Circuit, along the lines of every other federal court case that we have found interpreting unfair trade practice, says mere negligence is not enough. And negligent omissions especially are not enough. So, Your Honor, I don't know if it's central to the issue, but I think it certainly informs the issue. And then when we get to the statutory interpretation point, aside from the policy issues, the FTC's position is that 5N, the limitations, are the beginning and the end. And we say, no, you have to give meaning to unfair trade practice itself in 5A. And we could have a long debate, but let's remember the legislative context in which this arose. In 1980, Congress was concerned about overreaching by the FTC. And so you have the policy statement. In 1994, 5N was amended to bootstrap the policy statement. Now, the FTC would have the court believe that when Congress enacted an amendment that was in response to overreaching by the FTC, what Congress did was eliminate the first part of the statutory language and, in fact, Your Honor, in fact, create a regime in which it's not only mere negligence under the FTC's view, but it's actually strict liability. And, in fact, Your Honor, if you look at page 44 of the FTC opposition brief, it's very significant. This is step one. I hate to say it. People will be back here. We'll all have less hair or maybe a little more gray. But they're going to have this issue of whether data security breaches, one could be held liable under a strict liability standard, and you see that in the FTC briefs. They say common law principles do not limit the FTC's authority under Section 5 as a general matter. And then they go on to say that the FTC's authority may extend beyond the boundaries of the common law. It does not mean that Wyndham didn't receive notice, et cetera. Make no mistake, their position is that this can be read as a strict liability statute. And I would say Congress didn't act in 1994 to substitute the meaning of unfair trade practice. I would say they limit it. In fact, the FTC in their brief, again, page 22 and then at the bottom from 24 to 25, they say, Your Honors, that Congress did limit the FTC's authority once and only once during this amendment. So how could they limit the authority and yet eliminate the first part of the statute and all the federal court decision law applying what we say is higher than a negligence standard? You've been up almost 20 minutes, and yet you haven't addressed whether the FTC can bring this action under 53B in the first place. And without declaring that unreasonable service security practices are unfair through an administrative process either by rulemaking or internal adjudication. Why not? So the court's letter of February 20, 2015. May I finish this answer? You're on our time now. Thank you, Judge Becker. So I'll take that as a compliment. Have they declared the cyber practices unfair? No. I don't think consent decrees count. I don't think the 2007 brochure counts. And I don't think Chevron deference applies. So are they asking this federal court in the first instance? I think the answer to that question is yes, which then gets to the money question, the third question. And under Ninth Circuit Evans, the FTC, the statute says proper case, which one can argue would be the routine application such as a fraud case. Evans, the Ninth Circuit, says it's actually the application of any alleged violation of the FTC Act. So you look at Evans and say, well, all right, maybe Evans was wrongly decided. Seventh Circuit? And I didn't mean this with respect. He's a professor of mine, Judge Ripple. Okay? Not an expansive constitutionalist. Okay? Judge Ripple says, I think the Ninth Circuit is right. And then you have a series of district court cases. The only one that we found actually disagreeing with Judge Ripple and Evans is Judge Goodell and EDC. But that later is not vacated, but there's a later opinion in Milan Labs in which Judge Hogan then says, oh, no, I adopt the broader interpretation. So, again, this backdrop on 13B, I'm not ñ believe me, I know I'm here asking the court for various things. And I'm tucking my powder dry on 13B because I don't think I should convince the court to create a circuit split. And I think any alleged violation is fine. Plus, as a prudential matter, as a prudential matter, we actually thought about this. And I would prefer to be in federal court in front of Article III judges as opposed to the agency. Since 1995 ñ Isn't that the real answer? I can't figure out why the agency doesn't want to be in front of itself. And statistically, Your Honor, in terms of the empirical evidence, since 1995, only one defendant has prevailed in front of the agency. So, yes, as former litigators, I like my chances better in front of life tenure and Article III judges. That is one answer, Your Honor. But even if the court were inclined to reach out and say the Seventh Circuit and the Ninth Circuit are wrong, and then I think you get into another discussion regarding Francis Ford and whether they should have engaged in rulemaking if this is really the term. I think this is a novel interpretation. But you don't need rulemaking. I mean, you could go through the adjudication process. So I would actually go ñ The courts give a lot of discretion to the administrative agencies on that, don't they? The courts clearly are tenuring. The agency has discretion as a general matter, as we said in our brief. But I think this then gets into the notion of Francis Ford Motor, which is discussed by the Ninth Circuit. There are limited circumstances that adjudication is limited. And when the agency embarks on a wholly new path, and I would say that mere negligence or drug-wrought negligent omission is a wholly new path, then I think that rulemaking, which the FTC has the power to do, and this court has looked at in the funeral director's cases. Now, the FTC's response to that in the district court was, well, it takes a lot of time. That may be true, but that's part of administrative law, is that the time actually renders benefits so that courts aren't wailing around in trying to find out what the answers are. So I think that it would have to be rulemaking. And then my last point on 13B, your Honor. Let me ask really a quick question. Yes, go ahead. Don't we need to go further into this case in the pleading order to determine really what has been done, what notice there was? Is this really someplace that the FTC should step in? I'd have to give that some more thought, your Honor, but I don't think so. And my thoughts are somewhat preliminary since last week, but in some ways we're in a world where we're now talking about claim splitting, because there could be no real dispute that the deception claim was properly in federal court. As Judge Ambrose, you asked by your questions, and I said earlier on, deception agenda is protected by our position in this case. And so they filed in federal court under deception, and it's been hard for me analytically to sort whether the agency would then be encouraged to split their claims so that we have an agency proceeding and then a federal court proceeding. I don't think that's the right answer either, competing proceedings. So I think getting back to the court's question of February 20th, the deception claim is clearly here under 13B. And then the question is if I were litigating to stay in federal court, which I am, I would make the arguments I've already made, but I would also say you shouldn't, just as a matter of judicial economy, split out the unfairness claim to the agency since the federal court claim. It's almost like a pendant claim or supplemental jurisdiction. And I know we're far afield now, but there's no other way to reconcile the unfairness claim and the deception claim with one exception, dismiss the unfairness claim. And then we don't have the 13B issue. The judge has a question. On the possible remedy here, if all the district court could award would be injunctive relief, would that change your arguments on notice and due process? So I think, Your Honor, the agency has pled injunctive relief that includes discouragement, which I think is another reason why I think the agency is here. But I'm saying if all they could get was injunctive relief without discouragement. Then would that change my arguments on 13B? Yeah. I don't think so, Your Honor. I'd want to think that through a little bit, but I don't think so. I think that it would make the 13B issue actually more clear, because then they would only be going to the court for a narrow application injunction consistent with the legislative history. That's clearly what Congress wanted. They wanted the agency to be able to go to federal court. Now, here it's a little odd since it's been six or seven years after the breach, and we've been in federal court two years, and they haven't moved for an injunction. And I think when they do move for an injunction, they can't get an injunction. So in some ways it is a little head scratching, Your Honor. I think we all come at that. We're here, they filed on 13B in order to get an injunction, and they haven't moved for an injunction, and they haven't even pled what's necessary for an injunction. In fact, Your Honor, one of the first things, this is in the record, one of the first things we did in district court was file a motion saying, tell us what kind of injunction you would like, because unreasonable data security isn't detailed under Third Circuit case law. You'd have to have an order under penalty of contempt. The agency objected, then the agency objected again, and they don't want to tell us what exactly the order would look like, which I think, yes, Your Honor, in some ways we're chasing our tail here, because I don't know if they're ever going to move for an injunction. But in my final, with the court's indulgence, the one thing I didn't say, if I have 30 seconds on substantial consumer injury, because it's why I think they can't get an injunction. Well, we'll get you back on that. But part of the question on this part, what is a proper case under Section 53B? A proper case under the Seventh Circuit and Ninth Circuit's assessment is any alleged violation of the FTC Act. And if I'm guessing, Your Honor, and your question is in terms of original jurisdiction, I think the FTC, that's a limit on remedies, 13B, as opposed to what I think they're here under 1331, 1337, and 1345, original jurisdiction. I think there's a jurisdiction that lies in the district court for this action. I think 13B is a question of alleged remedy at some point, but under the broader interpretation by the Ninth and Seventh Circuit and Judge Hogan in Milan Labs, I think it's any alleged violation. Irrespective of whether a novel theory is being proposed. So this is clearly a novel theory. And so I'm not arguing to create a circuit split on that. I'm happy whether one takes the position of Judge Ambrose's observation or a more scholarly observation that I don't want to create a circuit split. I'm happy with being in federal court. Thank you. Thank you, Your Honor. Mr. Marcus. Thank you. May it please the Court, I'm Joel Marcus from the Federal Trade Commission. If I can just ask you to, I guess we call sort of issue zero. Has the Congress entrusted the FTC with declaring new practices unfair in the first instance? Well, Congress certainly entrusted the FTC with defining the scope of unfairness, a very broad word that Congress has limited only once. And so what Congress has also done is it's given the FTC a choice between proceeding in the first instance as an administrative matter, that's under Section 5 of the FTC Act, or proceeding under Section 13B, codified as Section 53. Yeah. When we say 53, we mean Section 53. That always makes it confusing. So in answer to Sirica's question, the agency often exercises its discretion to proceed under Section 13B because there are remedies available to the commission in federal court that are not available to the commission in the administrative process. So, for example, the courts of appeals that have addressed this issue have unanimously concluded that the scope of injunctive relief also includes equitable relief like rescission of contracts and restitution and, you know, equitable monetary remedies that the commission itself does not have the authority to award. The commission itself under Section 5 of the FTC Act can only issue what the statute calls a cease and desist order, and that's, you know, that's the case. Has the Supreme Court blessed that broad interpretation of remedies beyond injunctive relief? Well, the Supreme Court has in cases like Porter v. Warner and the DeMayo case. The court doesn't have briefing on this, of course, but this is a fairly established body of law, particularly in the courts of appeals. This court actually itself addressed this once in an unpublished opinion where it accepted, as a general matter, the theory that's been widely adopted by other courts of appeals throughout the country. Let me see if I have a cite for that. I'm afraid I don't, but we would be happy to supply the court with that upon request. So Congress has given the FTC this choice, and there are reasons why the FTC might proceed in one venue rather than another venue, but that also leads to the underlying question, can the FTC choose to have a case that makes new. That's a good point. Assuming the FTC has not yet declared unreasonable cybersecurity practices to be unfair, are you asking federal courts to decide that in the first instance? Yes, and that is the – so let's table whether we're asking the federal courts to decide that in the first instance because I don't think we are in light of the LabMD order in particular. LabMD was a motion to dismiss. I mean, that's not really – Okay, so if I can just table that discussion, but the answer is yes. How long do you want to table it for? Until I give this one answer, Your Honor. So the FTC has brought novel theories of unfairness in federal courts before. So the Neo V case, for example, which involved that check service, it's a Ninth Circuit decision, and it involved a service where you could write electronic checks by supplying your account number, and it turned out to be a kind of open bar for people committing fraud. That issue had never arisen before the FTC before, and yet the FTC brought the case in federal court, presumably because there was a lot of potential restitution to help consumers get some of their money back. In cases like the Cramming cases, these are referred to in footnote 11 of the FTC's red brief, the FTC brought cases against telephone companies who were acting as billing agents for people who were putting fraudulent charges on people's telephone bills. The telephone companies themselves were not the people committing the fraud. They were merely the conduit for the bills. But even though the FTC had not previously addressed that as an administrative matter, the FTC brought the case as a 13B case in federal court. Was the AccuSearch case? The AccuSearch is a Tenth Circuit case. But was that a direct action in federal court, or was that permanent cease and desist? I believe the AccuSearch may have been an original, pardon me, one for one agency. Yes, that would have been an original action in federal court, I believe. Okay, let's go back to the question. Assuming the FTC hasn't yet declared unreasonable cybersecurity practices to be unfair, are you asking federal courts to do that in the first instance? Yes, and there's no problem with that, because that's the choice that Congress has made to allow the FTC to proceed in either direction. And is that just the last proviso in 13B? Well, so, yes, it's the second proviso in 13B, and it's the one that says, provided further, that in proper cases, the condition may seek, and after proper proof, the court may issue a permanent injunction. But the preface to that is in the beginning. I mean, you want the legislative history to talk about fraud. Well, they talk about fraud. In fact, the Seventh and the Ninth Circuit cases, Evans Products and the Seventh Circuit cases, those were essentially fraud cases. Well, Niobe certainly didn't discuss the meaning of proper case, but Niobe wasn't really a fraud case. It was more akin to this case. That was the check wagon company. And the legislative history does give fraud cases as a kind of paradigmatic example of the sort of case that would clearly be a proper case. But I think if you read H. N. Singer in the Ninth Circuit, and if the court doesn't have a citation for that, it's 668 F. Second, 1107 OK, and the Evans case and the World Travel case in the Seventh Circuit, they're not limiting in those decisions. But Singer, for example, the page we're going to get to, I guess, is 1111, is that it was a routine fraud case, right? Singer itself may have been, but the court spoke more broadly. Evans, I don't believe, was, and the case was actually, the issue was actually litigated there. And so it wasn't just, you know, kind of offhand dictum. And so, but if you read 53B1, it refers to when the commission has reason to believe that any person, partnership, corporation, et cetera, is violating or about to violate any provision of law enforced by the Federal Trade Commission. So that suggests that Section 5, which is a provision of law enforced by the Federal Trade Commission, can be, and that's the provision without laws unfairness, can be a proper case. An improper case would be, for example, a case that's specifically excluded from Section 5, such as a case against a common carrier or a meat packer or an airline, you know, or one of the. But the concern I have, it looks like when 13B was passed, you have the Senate report number 93151 says, quote, the commission will have the ability in routine fraud cases to merely seek a permanent injunction in those situations in which it is not desired to further expand upon the prohibition of the FTC Act with the assurance of a cease and desist order. And then I'll concede there are cases in the age where courts have gone further, but it looks like when you come back to the statute, at least to the extent one puts credence in legislative history that's sometimes written by staffers for one boss, not even necessarily a whole committee, let alone Congress, it looks like it's to be done in a very small set of cases. Well, I don't think that even if you could ascribe that intent to that statement to the entire Congress, which some judges think you can, some think you can't, I don't think it's entirely fair to read that as a strict limitation on Section 13B. I think that is the kind of case that was, you know, the kind of obvious example of the case that would be brought. But with that... But you've got commissioners back then. Let me just give you a quote from Commissioner Sterik. In 1995, the legislative history, this is a quote, that the quote legislative history indicates that the permanent injunction proviso is to be invoked only when the agency concludes that a case presents no issues warranting detailed administrative consideration. What you're dealing with here in cybersecurity would seem to warrant detailed administrative consideration. So if I may then now shift gears to whether this case warrants detailed administrative consideration. May I ask you a question before you... I'm sorry. You may let me finish. That's okay. I'll come back. No. Why is discouragement indicated in this particular case? Well, it may or may not be, depending on the proof that's introduced at trial, if the FTC can show that there were charges placed on credit card bills that consumers couldn't reasonably avoid and that they wound up with out-of-pocket expenses, something that's very, very possible. Well, in an administrative proceeding, you could find out whether they were all reimbursed as alleged, couldn't you? Well, yes, but then the FTC, in an administrative proceeding, would not have the authority to... I understand that. ...then go. Are you precluded from doing both? From filing, going directly into court afterwards? Well, we are subject to, in Section 19 of the FTC Act, there's a provision that allows the FTC to seek damages after a cease-and-desist order is issued, but it has procedural hurdles and it has standards of proof and all of that are significantly more burdensome, and so the FTC rarely does that just because it's much more difficult to get actual redress for consumers, which is what we're after at the end of the day. And so, again, it's... No, I understand in the general case. I'm wondering why it...well, maybe it hasn't been established, but the argument is that no money is owed at this point. That's Wyndham's argument, and, again, this is, you know, we're at a motion to dismiss here, and so there are many questions in this case that remain to be proved, you know, either on summary judgment or on a trial on the merits and the scope of equitable relief and what exactly happened, you know, in terms of the data breaches, and we don't know at this point. We have the FTC's allegations, which, at this stage in the proceedings, I think the court needs to take as a given, and those allegations are, you know, fundamental security failures, lack of firewalls, you know, lack of encryption, failure to update security systems, you know... Can we regulate a statute by engaging in conduct that the FTC has yet to declare unfair, pursuant to its authority under M, Subsection 8? I think so. I think that the term unfair is more or less defined by Congress. 5N, which was adopted by Congress in 1994 to codify the FTC's own policy statement from 1980, takes the virtually boundless word unfair and puts some substantial bounds on it, and it has three factors. First, there has to be substantial harm to consumers. Second, the harm has to be, you know, reasonably avoidable by the consumers. And third, there's a kind of cost-benefit analysis that the statute... Aren't your opponents saying that that creates a circle, a limit within which you can operate, that that doesn't mean that everything within that circle you can do? Well, they start from the position that the word unfair is severely limited and that Congress limited it even further. I don't think that's a correct reading of the way the Supreme Court has interpreted unfair. I don't even think it's a correct reading of the dictionary definitions of unfair. I think that unfair has been read by the Supreme Court and was actually intended by Congress. If you look at the legislative history from 1914 all the way back, it was intended to essentially encompass every manner of consumer harm. That's essentially what the D.C. Circuit's case in American Financials determined. And by defining the outer boundary of the essentially unlimited word unfair, Congress, in effect, created the definition of unfairness. And other courts have read the statute that way, particularly the Ninth Circuit did that in the OV. If you read the opinion, it says the FTC, an act is unfair if it, X, Y, Z, goes through the three 5N factors. The Tenth Circuit read the statute that way in AccuSearch. And I think that it makes sense as a logical matter to do that. When you have an essentially unbounded concept, when you establish a boundary, the boundary becomes, in effect, the definition of what it means to be unfair. And so what is a proper case under Section 13B? Well, so this goes back to our earlier discussion. And I don't think there's any real disagreement between us here. I think the Ninth Circuit – Well, but basically he doesn't want to be before you in your own little den because he's not sure he's going to get a fair shake in his view. So what is a proper case under 13B? So a proper case, and the FTC is in agreement with the Ninth Circuit and the Seventh Circuit, certainly that a proper case is a case that involves a violation of any provision of law enforced by the Federal Trade Commission. That's consistent with the statute, and it's the way courts have approached this. And as we were discussing earlier, there may be some legislative history that touches on this issue, but I don't think that that really limits the concept. When you look at 5N, it says that the commission shall have no authority to declare invalid, unlawful, an act or practice as unfair unless it causes etc. It also acknowledges that the commission may consider established public policies in making this determination. Doesn't it look like – don't you get the whole thing? Don't you have somewhere back in the dugout, say, the commission finds this to be unfair? Well, certainly every time the commission issues a complaint, it takes a vote on that complaint, and there has to be a majority vote by the commissioners just to issue a complaint, including a 13B complaint in federal court. And so certainly those factors – What kind of notice is that, that it's an unfair practice deemed by the FTC other than they filed the complaint? Well, in terms of notice, I think it's important to separate the notice aspects from the underlying legal violation aspect. So the statute, you know, kind of in terms of what is unfair, it speaks for itself, and it has been interpreted by the commission for many, many years to focus principally on consumer injury and then has those other factors in it too, the avoidability and the cost-benefit analysis. And so in terms of the underlying liability issues, whether you violate the statute, you know, the focal point has been whether consumers have been injured. I apologize, and that is, you know, directly out of the 1980 policy statement where the commission said – and this was basically codified by Congress quite directly – unjustified consumer injury is the primary focus of the FTC Act. And that's what 5N is after, and that's what people are looking for. You say that the FTC has to vote to file a complaint. That's correct. And I think in this case, did not Commissioner Roche dissent? Yes, I'm being – Commissioner Roche, too, I think. Can you supply us a copy of that dissent? Or is that dissent? Let me – was it a written dissent? He just said, I dissent. He did not supply anything in writing. I wish we could do that. The Supreme Court just used to do that back in the old days. But still, there was, you know, a majority vote. It was, you know, it was duly voted on by the commission, and that doesn't make it any less of a, you know, commission official act. I would like to circle back, Judge Ambrose, to the underlying question here, which is whether the FTC is actually – and this is question one in the court's letter – has actually addressed some of the policy issues here. And I think that the answer is an unmistakable yes. The LabMD order, an interlocutory order to be sure, but a – Interlocutory order, and it's on a motion to dismiss, and I don't know of any internal FTC rules that say that that type of thing is precedent, is it? Well, it's the litigation position of the FTC ruling on the matter before it. It's not actually the litigation position, because the way the administrative proceeding works is there's a separated trial staff who acts as the litigators, and they litigate before the ALJ, and the commission sits as an adjudicator in those cases, just like a district court judge sits as an adjudicator, and then the matter is reviewable in the court of appeals – thank you, Judge Ambrose – directly from the commission's own decision. So in that case, the commission wasn't just saying, oh, well, we're the lawyers here, and we – But the district judge isn't arguing before herself the district judge. I am saying – You just have jurisdiction to hear me. It's an odd artifact of some of the progressive era and New Deal agencies. The FCC has the same kind of thing, and I'm sure other agencies do as well. I think some of the health and safety agencies do, where they have commissions acting in dual capacities. But the important point is that the LabMD order represented the commission's policymaking determination as an adjudicative body in that case. The case was argued by the separated trial staff complaint counsel and LabMD's own counsel in a very formal process, just the way it would be litigated before a district court. And the commission, acting in its capacity as an adjudicator, issued a formal ruling. You've read the opinion. It's quite thorough. It's quite comprehensive. And it interprets the act, and it was voted on unanimously. This time there were no dissents in the LabMD order. And it was determined, you know, basically as an interpretive matter. We're reading our own statute. We're bringing our policy judgment to bear on these issues. And the commission determined that a failure to protect data security was an unfair act within the meaning of Section 5 of the FTC Act. And, you know, we can debate whether that's Chevron deference or some lower form of deference. We believe it's Chevron deference, but there are some arguments contrary perhaps. But nevertheless, it does represent the commission's formal determination as an adjudicator, voted on by the five commissioners, that it is an unfair practice to fail to adopt a security, data security. And the timing of it was after the events that occurred in this particular case. The timing of that particular case. Again, now, Judge Sergis, it's important to separate the notice part of this case from the underlying authority part of this case. So in terms of the notice part of this case, yes, LabMD was after the events here, but there were many, many other administrative complaints that had been issued prior to that time, at least five of them unfairness complaints, where the commission basically said you didn't have firewalls, you didn't have password security, you didn't have updates. And these all happened in a consent decree? Well, the cases ended in a consent decree, but the commission issued a formal complaint, administrative complaint, Part 5 complaint. And each one of those complaints was published on the commission's website. And, in fact, it was put out there before the consent decree is entered, the complaint and the proposed decree are put out for public comment. So this is a very public proceeding where the commission announced quite plainly a set of acts that it would consider to be unfair acts under the FTC Act. What kind of deference do you want to give to LabMD? Well, as we argue and argue. It's not Chevron deference, is it? We think that there's a good argument to be made for Chevron deference. Even though that normally applies only to final agency acts? Well, you know, I think that, as we pointed out in our 20HA letter, the touchstone of Chevron is not so much finality but formality. And the LabMD order is a formal order adopted by a unanimous vote of the commission at the end of a particular point of the adjudicative process. And should I wait for Ted to go? No, you go ahead. Okay. You can walk and listen. So even though I prefer not to get bogged down in a debate about Chevron. You know, at the very least, there are other forms of deference that the Supreme Court has recognized. And let's assume we give no deference at all. It may be persuasive. We may agree with everything in it, but we give no deference at all. You're not in a great position. Well, I think that you still have before you, even under that scenario, Judge Sterka, you still have before you a formal order of the commission taking the policy position that the court seems to think is important here. And the policy position is that this set of acts or omissions is an unfair practice under the FTC Act. Judge Roth, you were asking about the concept of act versus omission before, and I think that if you look at the International Harvester case cited in our read, that's an FTC case. That was a pure omission case. It was a failure to notify of a hazardous condition. And in NAOBI itself, the Ninth Circuit warned against, you know, immunizing a Web site operator for returning a blind eye to improper practices. That, again, was an omission case. Let me come back to the NB thing that's troubling me. Assuming that complaints and consent decrees or decisions on motion to dismiss are clear enough to give notice when companies read them, how do companies know when they should be reading them? Well, I mean, that wouldn't be my first – if I were counsel as advising somebody, that wouldn't be the first place I would necessarily look as to whether there was an unfair practice. Certainly, Congress gave the FTC a very broad jurisdiction over, you know, almost all sectors of the economy. And I think any careful general counsel would be looking at what the FTC is doing, because there are all manner of unfair practices. The FTC has gotten involved in a vast array of different types of unfairness and practices. There are all kinds of, you know, complicated statutes that apply to almost everything corporations do, particularly big corporations like Wyndham. And so, you know, if you're a careful general counsel, you do pay attention to what the FTC is doing, and you do look at these things. Keep in mind if you're going to notice, Judge Ambrose, Wyndham itself said right on its Web page, we follow commercially reasonable practices. We encrypt our data. We use firewalls. I don't see how you can possibly come and say we had no idea we were supposed to encrypt our data. We had no idea we were supposed to use firewalls. No, the idea is encryption by a certain standard, firewalls by a certain standard. Well, at this point, the allegations of the complaint are essentially no firewalls. At this point, the allegations of the complaint are, you know, passwords that didn't even pass the minimal level that they were like essentially password as your password. It wasn't quite that bad, but almost. And so keep in mind, again, we're at- Have you informed the public that it needs to look at complaints and consent decrees for guidance? Well, again, these are businesses that operate in- Do you have examples of where that's been done? Well, in terms of, you know, specific notices mailed out to companies saying, hey, you need to look at this, I don't think so. But this is an important federal agency that undertakes, that has broad-ranging jurisdiction and undertakes frequent actions against all manner of practices and all manner of businesses. But this is not only businesses that require cybersecurity. Should the FTC be the cop in this area, or should we consider whether we want a comprehensive regulation not only of commercial businesses, but of government agencies, of nonprofit organizations, you know, across the board? Should the FTC jump in and grab a certain portion of that and say, we're going to be the czars here? Well, right now, Congress gave the Commission authority over acts, commercial acts in interstate commerce. Congress has not at this point, except in a few narrow areas like banking and some credit card transactions and health care information, Congress has not spoken in the more comprehensive way that you're referring to. One of the difficulties, of course, is that this is one of the fastest-changing areas of technology, and it's exceedingly difficult to come up with specific standards, particularly when you're an administrative agency and you have to conduct rulemaking procedures and things like that. Should an administrative agency be the body that creates the standards? Well, you know, again, in terms of rulemaking, the FTC probably has authority to do that. It's a very cumbersome process, and I think ultimately a Sisyphean task. It would never end because the technology changes so fast. Congress can step in if it wants to. I think one way of reading Congress's inaction is that it's content with FTC enforcement on a case-by-case basis. Well, in the present day, I'm not sure inaction can be read as any rational motivation. But nevertheless, I think that it's important to keep in mind here that we're not talking about whether, you know, the 13-letter password with the asterisk and the exclamation point. We're talking about very fundamental failures of data security, fundamental failures of data security that Wyndham itself knew that it needed to undertake in order to protect its customers. And at the end of the day, the FTC is a consumer protection agency that is, at this point, the only consumer protection agency that is able to proceed against companies that accept confidential data from their customers and then fail to take steps to protect that data. That's what we hear about failure to take steps. In defining unfairness, do you continue to press the negligence analogy you did in LabMD? Now, there's two aspects of this, Judge. One is the notice aspect. I understand. And so our argument there is that there's a general background standard of care that all companies know they have to, you know, adhere to. And the general reasonableness and negligence standard is part of the notice case. In terms of the unfairness, our position is that 5N effectively defines unfairness. Reasonableness and the kind of negligence-like theories are incorporated into that cost-benefit analysis that Section 5N incorporates into the statute. So, in other words, the FTC has the burden to show that there weren't countervailing benefits that offset the harm to the consumers. That's like the kind of law and economics view of negligence that, you know, courts have adopted. It's not just you were negligent, therefore it's unfair. It's a much more complex undertaking than that. And it's one, of course, that is best conducted in the first instance, not before an appellate court on a complaint, but in front of a district court who will take evidence establishing the three factors that are relevant here. And it will be able to assess on the entirety of the 5N factors whether or not Wyndham has acted unfairly. As a matter of fact, obviously we make the decision on the basis of the statute and cases. But as a matter of policy, why don't you take that argument one step further and say, from your point of view, why isn't it better for the agency to make that determination on a complaint, get a cease and desist order, and establish a principle, and then have that adjudicated further rather than going directly to the district court? Well, in terms of the principle, of course, it is the FTC's view that we effectively have established that principle and that the specific standards of the sort that Judge Roth is referring to are things that can be established through testimony and through evidence and will be a factual matter for the court to decide. What were the failures? Were there any offsetting benefits to those failures? That's the sort of thing, by the way, that district courts do every day. They take expert testimony. They make decisions. That doesn't require any specific policymaking judgment necessarily. These are factual determinations. And even in FTC cases, the FTC often brings cases involving whether your advertisements for your dietary supplements are supported by scientific evidence. And in 13B cases, the commission frequently brings cases that say your studies don't support the claim made, and the court will hear expert evidence from doctors and from scientists, and they're debating the studies that do or don't support them, what the flaws in the methodology were, things like that. And that is a factual matter. The underlying policy matter, I think, has been addressed by the commission over and over again in 50 data security cases brought at the administrative level. In cases like LabMD, the commission has voted, with the vote of all the commissioners over and over again, to support the idea that a failure to have adequate data security is an unfair practice under the FTC Act. And at this point, I think it begins to look more like your kind of typical run-of-the-mill case than a novel application of the Act. Again, the specifics may vary from case to case in terms of what happened, in terms of whether or not it was reasonable. But, again, that's the sort of thing the district courts look at every single day of the week, and they determine. For that matter, district courts look at novel statutes every day of the week, and they determine, and courts of appeals, then on appeal, look at novel statutes. I don't think that's required here. Any further questions? With no further questions, we respectfully submit that the court affirm the district court's judgment and allow this case to return for trial. Thank you very much. Thank you, Your Honor. Mr. Asaf. Okay, this last one is where we probably will stick for five minutes. May it please the court? A couple of housekeeping matters. First, the complaint was voted out with a dissent. I think Commissioner Walsh did not write a dissent for this case, but referred to his other writings objecting to the use of an unfairness claim without standards. Secondly, the LabMD case, which the court has asked about, again, that was a 4-0 decision as well. One commissioner had already been recused. It goes to the point of why we don't want to be at the agency. Commissioner Brill had already said enough publicly to say that, well, she had preordained the results. I would encourage the court, and I don't think it's part of the record, but I think it's available to the court and we're able to submit it. The FTC's motion or decision on the motion to stay LabMD is a critical document, not only because it discusses reliable sprinkler, which is 324F3 at 733, saying that the agency can change its mind, this is only an administrative complaint, there will be policymaking afterwards. It goes exactly to the panel's questions. But I also think when you marry that with the 11th Circuit brief that they filed, clever to be sure, but I think there's serious questions of estoppel. They were trying to tell the 11th Circuit, oh, this isn't final, this is just in the beginning, a lot of things could change, and now they're here saying, oh, well, we've made a decision, and we're entitled to deference, whether it be Chevron deference or Skidmore deference. I don't think they could reconcile the two. If all of your cases on fair notice pertain to the agency's interpretation of its own regulation or the statute that governs that agency, does this fair notice doctrine apply where it is a court announcing an interpretation of a statute in the first instance? I think it would, Your Honor. I think if you go to Ford Motor from the 9th Circuit, which is cited on briefs, I think that's what was happening there, that the court said, although rulemaking by adjudication is allowed under Chenery, there are limits to it, and when the court is asked to announce a new rule, basically, we are going to say, no, no, no, you have to go to rulemaking, not by adjudication, rulemaking. And while the FTC has said this is cumbersome, it could be. But if all the things that the agency does, and I applaud their mission most of the time, but actually time and effort here would be well spent. People are looking for guideposts. To your question, Your Honor, this does not change their deception theories. They can still go after people for deception. But Judge Roth, they could say, for the time being, we're going to look at PCI standards and NIST standards, and companies are on notice of that. Or to your question, Judge Ambrose, the answer is no to your question, have they ever published a rule or regulation or interpretive guidance saying people should look at our consent decrees and our 2007 brochure. The answer to that question is no. Can't they give a publicly accessible statement such as was done in the Beverly Health Care? So Beverly Health Care, I think, illustrates the point. I think it goes to also the Whitman case. When there is a narrow amount of gap filling, in other words, for the protection of workers, and then the question is, does travel expenses get paid for their testing after they've been nipped? That's a pretty narrow gap to fill, as opposed to here, which is a large gap. And, again, it's against the backdrop that there's not a single federal court case saying negligence is enough for an unfair trade practice. So if you look at Beverly Health Care and then maybe you look at TJX or you look at the card system solutions, aren't you really on notice that these are the types of things that are really troubling the FTC in this new era that changes seemingly every month, cybersecurity? I don't think so, Your Honor. In fact, I come back to Beverly Health Care. I forgot who wrote it, but the phrase, ascertainable certainty. If anything, the notice that you should avoid data security practices that are unreasonable, I don't think, with all due respect, comes close to ascertainable certainty. And remember, in that case, was the roof 13 feet or was it 12 feet? Was somebody on notice that it was close enough? Here, we're in a much different world. I would like to, Your Honor, if I can, I promise you I'd get to substantial consumer harm, and it's not a pleading issue. It goes directly to, again, even if you accept their limitation of 5N, here if there's one amicus brief that I would encourage the court to read, it's the Electronics Transactions Association, because what's happening here, and you all talked about this, there's a lot of policy here besides statutory interpretation. The costs are enormous on company, but also the system has already taken care of the unfairness cost. And why do I say that? Federal regulations say you're reimbursed, $50 is the limit. Card brands, however, have said zero. And so if we accept the FTC's proposition that they are the agency charged with this and they've developed an expertise, they've conducted a two-year investigation and then they've plied around what all the courts across the country know, that consumers are paid out-of-pocket zero on these breaches. And that's a decision that the stakeholders have already made. The banks, the merchants, the card brands, that consumers pay zero. And so there's a reason why they've plied around that. And so it's Iqbal Twombly Plus. We're spending all of this energy when the agency knows to this date they haven't identified a single person who lost a dollar. And because the scheme is set up to do that, as opposed to deception, if somebody's saying we do this and they don't deliver, they could be sued by the FTC. The allegation is that there were, over the course of two years, 600,000 people that had their accounts hacked and there was $10.6 million worth of damages. The allegation was $10.6 million in unreimbursed fraud loss. And at the district court they're denying that. You're saying to some extent it's being paid for by? Well, Judge Salas pressed them and they said, well, hypothetically, somebody couldn't have been reimbursed. But we now know it's a judicial admission, and as an agency I think they have a special obligation to acknowledge it. In the district court they've admitted they haven't found a single person. They've interviewed, I think, 380, and they can't find a single person. So it goes to even their notion of the statute, that it's substantial consumer harm, when they haven't found anybody who lost a dollar and we're here spending millions of dollars for an investigation. That's the next part of the case, if you get there. And so, Your Honor, in closing I would say, as I started, this is a modest approach. We are not asking the court to cut back on deception jurisdiction, and the FTC and consumers have a lot of tools. They have deception. They have unfairness that is more than negligence. And consumers, I've been following the debate on Bayer and BMW, in terms of a public law analysis, consumers here have lots of options if they were actually harmed. And so I would again ask Your Honors to consider the fact that unfairness, this would be the first case ever that a federal court has said mere negligence is enough. And, Judge Ambrose, I see you reaching for your mic. I know. Finishing up. And so I would ask the court to look at that. If the court would like additional briefing on either side. Of the two questions that were asked on February 20, I would ask counsel if they would submit a double-spaced, no more than 15 pages supplemental memoranda, let's say by house two weeks from tomorrow, if that would be all right, 15 pages each, filed simultaneously on those two questions asked on February 20. And then also I would ask counsel if you would get together with the clerk's office and have a transcript apparent of this oral argument and split the cost. And also then finally I would just like to thank both of you for exceptionally well-done oral arguments. Thank you, Your Honor. I appreciate it. And I speak for the FTC. We've been privileged to appear in front of judges who have been very well prepared for this. So thank you so much. Thank you, Your Honor. Thank you. We'll take the matter under advisement